UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TOMMY JENKINS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:22-CV-0960-B |
| | § | |
| CITY OF DALLAS, TEXAS, | § | |
| | § | |
| Defendant. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant City of Dallas, Texas ("the City")'s Motion to Dismiss Plaintiff Tommy Jenkins's Second Amended Complaint (Doc. 34). For the following reasons, the Motion is **DENIED**.

**I.**

**BACKGROUND[1]**

This is a workplace discrimination and retaliation case. Jenkins is a 57-year-old African American man. Doc. 31, Second Am. Compl., ¶¶ 8–9. In 2013, the City hired Jenkins as a "Code Officer II." *Id.* ¶¶ 6–7, 16. In his nine years working for the City, Jenkins estimates that he has applied for a promotion approximately eighty-five times. *Id.* ¶ 25. But for one reason or another, Jenkins was never selected for a promotion. *Id.* ¶¶ 24–25. This lawsuit is about one of the estimated eighty-five instances in which Jenkins applied for a promotion but was denied. *Id.* ¶ 25. Specifically, Jenkins alleges that he was denied a promotion to a "Supervisor II" position in 2020 because of his

---

[1] The Court draws its factual background from Jenkins's Second Amended Complaint. *See* Doc. 31, Second Am. Compl.

race and in retaliation for engaging in a protected activity in violation of Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act. *Id.* ¶¶ 52, 73, 80.

According to Jenkins, the reason he was denied the promotion can be traced back to 2014. *Id.* ¶ 26. At that time, Robert Curry, a white male, was Jenkins's supervisor. *Id.* ¶¶ 26–27. While he worked under Curry's supervision, Jenkins alleges that Curry engaged in racially discriminatory conduct. *Id.* ¶ 28. For example, Curry allegedly instructed Jenkins "to not issue citations or write-ups for code inspections related to white property owners but stated that citations and write-ups should be issued immediately to black property owners or Hispanic property owners." *Id.* Jenkins also claims that Curry "bragged about being, 'the new sheriff in town,' and he would yell at and treat Jenkins and other non-white employees in a hostile and demeaning manner." *Id.* ¶ 29. By contrast, Curry allegedly treated white employees with respect and "would not yell at them or demean them in front of other employees." *Id.* This preferential treatment "made Jenkins feel like a slave and Mr. Curry was the plantation owner." *Id.*

On one occasion, Curry allegedly "shouted at [Jenkins] in front of the other members of the department, 'I [i.e., Curry] am working on getting your ass out of here and trying to get you fired.'" *Id.* ¶ 30. When Jenkins attempted to remove himself from the situation, Curry followed Jenkins, "made a threatening movement" toward Jenkins, "got right in [Jenkins's] face," and continued to yell and curse at him. *Id.* Jenkins alleges that Curry never acted this way toward white employees, and that Curry's actions were racially motivated. *Id.* ¶¶ 28–30.

After this altercation, Jenkins filed numerous grievances against Curry for race discrimination with the City. *Id.* ¶¶ 30–31. Jenkins's initial grievance email "detail[ed] the abuse and hostility he suffered at the hands of . . . Curry" and stated:

> But I be damn if, I except [sic] any harassment from a manager that has and knows very little about, and a supervisor, who shuffles the beat of slavery mentality this is not 1954, 1964, this is 2014 . . . I am a "MAN" and treated both [of] you[2] with respect that neither of you deserve.

*Id.* ¶ 32. He explains that this last line "was a reference to the famous 'I am a MAN' placards of the civil rights marches of the 1960s." *Id.* When Curry learned of the grievances filed against him, he responded by "yell[ing] at Jenkins and promis[ing] . . . that he would make sure Jenkins 'never' got a promotion." *Id.* ¶ 45. Jenkins notified the City about Curry's threat, and the City transferred Jenkins out of Curry's department. *Id.* ¶¶ 34, 46, 58.

Jenkins claims that the grievances he filed against Curry "were not properly handled by the City." *Id.* ¶ 37. Despite his repeated attempts to obtain a final resolution of his grievances against Curry, "[t]he City did not process the grievances to a conclusion or notify Jenkins of any alleged conclusion." *Id.* "Instead, City management shouted at him and told him to 'stop' filing grievances and that it did not matter who he brought to support his claims, [because] 'he is not going to change anything and that no one has beaten the City.'" *Id.* (emphasis omitted). He alleges that "[n]umerous other City employees . . . have also filed complaints of discrimination and retaliation against City management employees only to have their grievances not timely heard or never heard to a conclusion." *Id.* ¶ 42.

After having filed numerous grievances against Curry, Jenkins alleges that it became difficult to obtain a promotion. *Id.* ¶ 46. According to Jenkins, "all of management was aware of Jenkins'[s] numerous grievances over the course of more than two years, and it was as if Jenkins had hit a ceiling on his promotional opportunities at the City." *Id.* Jenkins claims that "numerous

---

[2] Jenkins also made complaints about another supervisor, Mr. Tellis. Doc. 31, Second Am. Compl., ¶ 32.

younger and less senior employees (that had not filed grievances against management for race discrimination), that he trained, move[d] up the ranks while Jenkins was stuck." *Id.* ¶ 47.

The incident at the heart of this lawsuit occurred in December 2020, when Jenkins again sought promotion, this time applying for five open Supervisor II positions. *Id.* ¶ 52. "The qualifications for the [Supervisor II position] . . . included having a high school diploma or GED, five years of experience interpreting and enforcing codes and ordinances, investigating code violations and/or issuing citations and one year of lead work and/or supervisory responsibilities." *Id.* ¶ 53. After he submitted his application for this position, Jenkins received an email from the City informing him that he was selected for an interview. *Id.* ¶ 54.

Interviews for the Supervisor II position were conducted by a three-member panel. *Id.* ¶ 57. One member of the panel was Jenkins's former supervisor, Curry. *Id.* During Jenkins's interview, Curry's "body language and [the] manner in which [he] acted . . . was cold and sent the message that Jenkins had no chance to do well in the interview." *Id.* "[T]he other two panel members were verbally interacting with Jenkins and literally telling him things like, 'I like that answer Mr. Jenkins,'" whereas Curry "was cold and silent." *Id.* Jenkins was ultimately denied the promotion. *Id.* ¶ 68.

Jenkins pleads that he "was more qualified than" four of the candidates who were eventually chosen for the Supervisor II positions: Servando Galvez, Jeanne Robbins, William Castillo, and Corey Blacksher. *Id.* ¶ 62. Specifically, he pleads that "Galvez . . . a Hispanic male in his mid-late 30's . . . only had 3-4 years of code compliance experience at the time . . . [and] had no general Code experience at the time of the promotion." *Id.* ¶ 63. "Robbins . . . a Black female in her mid/late 30's . . . only had 5 to 6 years of code compliance." *Id.* ¶ 64. "Castillo . . . a Hispanic male in his early/mid 40's . . . had only 3-4 years of experience in Code Compliance . . . . [and] no current

knowledge of specialized units or general code." *Id.* ¶ 65. "Blacksher . . . a Black male in his early/mid 40's . . . had only 2-3 years in Code Compliance." *Id.* ¶ 66. By contrast, Jenkins had longer tenure and more experience than these four individuals; Jenkins also obtained his International Code Council certification while those selected had not. *Id.* ¶¶ 63–66. Moreover, Jenkins trained two of the candidates who were promoted—Galvez and Robbins. *Id.* ¶¶ 63–64.

Jenkins later learned through a Freedom of Information Act request that two of the three interview panelists, Mr. Garcia and Ms. Contreras, rated Jenkins more favorably than other candidates who received the promotion. *Id.* ¶¶ 62, 69. Both Mr. Garcia and Ms. Contreras rated Jenkins more favorably than Galvez; Ms. Contreras also rated Jenkins more favorably than Castillo, Robbins, and Blacksher. *Id.* ¶ 69. The third interview panelist, Curry, on the other hand ranked Jenkins much less favorably—in fact, "Curry's individual rating sheet ranked Jenkins worse than" every other candidate. *Id.* In addition, Curry ranked Jenkins much less favorably as compared to Mr. Garcia and Ms. Contreras. *Id.* For example, whereas Mr. Garcia and Ms. Contreras each ranked Jenkins "Very Highly Qualified" or "Highly Qualified"[3] in approximately ten different categories, Curry did not rank Jenkins as "Very Highly Qualified" in any category and only found Jenkins "Highly Qualified" in two categories. *Id.* ¶ 69(e).  Moreover, Curry ranked Jenkins as "Qualified" in seven categories; Ms. Contreras did not give Jenkins a single "Qualified" ranking, and Mr. Garcia only gave Jenkins one "Qualified" ranking. *Id.* Curry's negative marks allegedly "caused Jenkins to not be considered for even the second round of interviews despite his excellent qualifications." *Id.* ¶ 68.

---

[3] The ranking system appears to use the following scale: (1) "Very Highly Qualified" (2) "Highly Qualified" (3) "Qualified" and (4) "Not Detected."  Doc. 31, Second Am. Compl., ¶ 69(e).

In May 2021, Jenkins filed a charge of discrimination regarding the December 2020 refusal to promote with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission ("TWC"). *Id.* ¶ 82. In April 2022, after receiving a right to sue notice from the EEOC and requesting such notice from the TWC, Jenkins filed this suit. *Id.* ¶¶ 83–85. In his latest Complaint, Jenkins claims that by denying him the December 2020 promotion to the Supervisor II position, the City discriminated against him on the basis of race. *Id.* ¶¶ 72–77. He also asserts that the City retaliated against him "because of his protected activities," namely his filing grievances against Curry *Id.* ¶¶ 79–84. Jenkins brings his claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Texas Commission on Human Rights Act ("TCHRA"). *Id.* ¶¶ 73, 80.

The City moves to dismiss Jenkins's claims under Federal Rule of Civil Procedure 12(b)(6). Doc. 34, Mot. Dismiss, 1. The Motion is fully briefed and ripe for review. The Court considers it below.

## II.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) authorizes dismissal of a plaintiff's complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citation omitted). But the court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotations and alterations omitted).

## III.

## ANALYSIS

The City moves to dismiss Jenkins's Title VII and TCHRA claims for race discrimination and retaliation under Rule 12(b)(6).[4]  The Court addresses Jenkins's claims below and finds that each is sufficiently pled. Accordingly, the City's Motion is **DENIED**.

A.      *Title VII and TCHRA Claims for Race Discrimination*

Title VII makes it unlawful for employers to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Jenkins claims that the City discriminated against

---

[4] "Because one of the purposes of the TCHRA is 'to provide for the execution of the policies of Title VII of the Civil Rights Act of 1964,'" the Texas Supreme Court has "held that those analogous federal statutes and the cases interpreting them guide [its] reading of the TCHRA." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633–34 (Tex. 2012) (internal footnote omitted). Thus, the Court will not conduct a separate analysis of Jenkins's TCHRA claims, as the analyses and holdings will be identical to Jenkins's Title VII claims.

him on the basis of his race in violation of Title VII and the TCHRA by denying him the December 2020 promotion.

Jenkins seeks to hold the City liable under a disparate-treatment theory of discrimination, although he never labels his discrimination claim as such. *See Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) ("Disparate-treatment discrimination addresses employment actions that treat an employee worse than others based on the employee's race, color, religion, sex, or national origin." (quoting *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006)). To survive a 12(b)(6) motion to dismiss, Jenkins must "plead sufficient facts on all of the ultimate elements of a disparate treatment claim to make [his] case plausible." *Id.* (emphasis omitted) (quoting *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 470 (5th Cir. 2016)). There are two ultimate elements for such claims: "(1) an 'adverse employment action,' (2) taken against a plaintiff '*because of* [his] protected status.'" *Id.* at 767 (emphasis in original) (quoting *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013)).

There is no dispute that Jenkins suffered an adverse employment action when he was denied a promotion to the Supervisor II position.[5] However, the City contends that Jenkins's

---

[5] At first glance, it also appears that Jenkins alleges adverse employment actions aside from the refusal to promote. *See* Doc. 31, Second Am. Compl., 30, ¶ 73. For example, Jenkins pleaded that the following actions violated his rights under Title VII and the TCHRA: "The City's actions . . . regarding failing to process Jenkins's race discrimination grievances . . . , failing to abide by and follow City Code, failing to discipline members of management for race discrimination and retaliation, and in denying Jenkins a promotion to the Supervisor II position." *Id.* The City has moved to dismiss Jenkins's discrimination claim to the extent that claim is premised on anything other than the City's refusal to promote, arguing that these actions do not constitute adverse employment actions and are otherwise barred by the statute of limitations. Doc. 34, Mot., 4–9. In Jenkins's Response, however, he explains that "these prior actions . . . are [not] adverse employment actions upon which he seeks a remedy in this matter." Doc. 38, Resp., 34. Instead, these facts were pleaded to support Jenkins's claim with respect to "the four denied promotions in December of 2020, which are adverse employment actions." *Id.* Thus, because Jenkins's discrimination claim is premised solely on the December 2020 refusal to promote, the Court need not address the City's timeliness or lack of adverse employment action arguments.

discrimination claim must be dismissed because he failed to properly allege that he was denied this promotion because of his race. *See generally*, Doc. 34, Mot. The City primarily argues that the Second Amended Complaint is deficient in this regard because it does not "specifically identify a comparator employee who is not part of Plaintiff's alleged protected class and who received preferential treatment." *Id.* at 10. However, Jenkins was not required to identify a comparator to state a plausible claim for discrimination under Title VII.

When, as here, a plaintiff's case relies on circumstantial evidence of discrimination, a court may refer to the *McDonnell Douglas* framework to "determin[e] whether a plaintiff has plausibly alleged the ultimate elements of the disparate treatment claim." *Cicalese*, 924 F.3d at 767; *see Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 600 (5th Cir. 2021); *Scott v. U.S. Bank Nat'l Ass'n*, 16 F.4th 1204, 1210 (5th Cir. 2021) ("[W]e have recognized that *McDonnell Douglas* may still be used to frame the motion-to-dismiss inquiry."). Under *McDonnell Douglas*, a plaintiff must generally identify a comparator by alleging facts sufficient to demonstrate that he "was treated less favorably than similarly situated employees outside [his] protected class." *Olivarez*, 997 F.3d at 599; *see Angus v. Mayorkas*, No. 22-50600, 2023 WL 3918986, at *6 (5th Cir. June 9, 2023). However, while a court may consider *McDonnell Douglas* to frame the motion to dismiss inquiry, it may not "inappropriately heighten[] the pleading standard by subjecting a plaintiff's allegations to a rigorous factual or evidentiary analysis under the *McDonnell Douglas* framework in response to a motion to dismiss." *Cicalese*, 924 F.3d at 767 (5th Cir. 2019); *see also Scott*, 16 F.4th at 1211 ("[W]e must determine whether . . . [the district court] merely framed its inquiry with the standard or prematurely engaged in a rigorous factual analysis better reserved for a later stage of the proceedings.").

For example, in *Cicalese v. University of Texas Medical Branch*, the Fifth Circuit reversed a district court's dismissal of a complaint that "did not allege with adequate specificity that any 'similarly situated' . . . employee [outside the protected class] was treated differently." 924 F.3d at 767. The Fifth Circuit explained that the complaint was sufficient despite this deficiency because there were specific allegations that "various actions against [plaintiffs] were motivated by [illicit] bias." *Id.* at 768. This was enough "to 'nudge [plaintiffs'] claims across the line from conceivable to plausible,'" which was all that was needed to survive a motion to dismiss. *Id.* (alterations omitted) (quoting *Twombly*, 550 U.S. at 547). *Cicalese* and its progeny confirm that a district court errs in dismissing disparate treatment claims strictly because a complaint does not sufficiently identify a comparator under *McDonnell Douglas*, at least where there are other specific incidents alleged that would permit the inference that an adverse employment action was taken because of a plaintiff's protected status. *See id.*; *Olivarez*, 997 F.3d at 600 ("[C]omparator allegations aside, the complaint presents no other facts sufficient to nudge the claims across the line from conceivable to plausible." (alterations and citations omitted)); *Angus*, 2023 WL 3918986, at *7.

Therefore, while it may be sufficient—for purposes of surviving a 12(b)(6) motion—to allege that similarly situated employees outside the plaintiff's protected class were treated differently, such allegations are not necessary. *Compare Olivarez*, 997 F.3d at 600 *with Cicalese*, 924 F.3d at 768. And although a plaintiff may be required to identify a comparator at a later stage of the litigation, the plausibility of a discrimination claim does not hinge on alleging a comparator. *See Cicalese*, 924 F.3d at 767; *Raj*, 714 F.3d at 331 ("[The] complaint . . . [must] allege . . . facts, direct or circumstantial, that would suggest [defendant's] actions were based on [plaintiff's] race or national origin or that [defendant] treated similarly situated employees of other races or national

origin more favorably."). Thus, the City is incorrect in arguing that Jenkins's failure to identify a comparator is fatal to his Second Amended Complaint.

Ultimately, the question is whether the factual allegations are enough to "nudge" the discrimination claim "across the line from conceivable to plausible." *See Cicalese*, 924 F.3d at 768 (citation omitted). And upon review of the Second Amended Complaint, the Court concludes that Jenkins has alleged enough facts to make his race discrimination claim plausible.

Jenkins's claim is somewhat complex. Jenkins contends that Curry gave him a low ranking because of Jenkins's race. *See* Doc. 31, Second Am. Compl., ¶ 72. And, according to Jenkins, he did not receive the promotion because of Curry's ranking. *Id.* ¶¶ 69(e), 72. Therefore, the argument goes, if the cause (i.e., Curry's ranking) of the adverse employment action was taken because of Jenkins's protected status, then the adverse employment action itself was taken because of Jenkins's protected status. Doc. 38, Resp., 18–19.

Jenkins's theory of discrimination rests on two premises. First, Jenkins must establish that he was denied the promotion because of Curry's lower ranking. *See Story v. Best Way Transportation Inc.*, No. 3:19-CV-02704-M-BT, 2020 WL 5045658, at *4 (N.D. Tex. Aug. 4, 2020) (Rutherford, M.J.) (explaining that allegations that plaintiff's supervisor used a racial slur were insufficient to create an inference of discrimination where the supervisor was not "principally responsible" for plaintiff's termination), *report and recommendation adopted*, No. 3:19-CV-02704-M-BT, 2020 WL 5038503 (N.D. Tex. Aug. 26, 2020) (Lindsay, J.). Second, Jenkins must demonstrate that Curry gave him a lower ranking because of his race. *See Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006) ("In . . . disparate-treatment cases . . . discriminatory motive is required."). Only if the Second Amended Complaint contains allegations which make each of these premises plausible

may the Court conclude that Jenkins adequately pleaded his disparate treatment claim. *See Cicalese*, 924 F.3d at 768.

Viewing the pleadings in the light most favorable to Jenkins, the Second Amended Complaint has plausibly established the first premise—that Jenkins was denied the promotion because of Curry's ranking. Jenkins was an otherwise qualified candidate, and two of three panelists ranked him more highly than at least one individual who was eventually promoted—Servando Galvez. Doc. 31, Second Am. Compl., ¶¶ 63, 69. Moreover, the City's stated qualifications for the Supervisor II position required, among other things, that the candidate possess "five years of experience interpreting and enforcing codes and ordinances." *Id.* ¶ 53. Galvez only had three or four years of relevant experience and thus did not meet the City's stated qualifications for the position; Jenkins on the other hand, had at least eight years of experience in code interpretation and enforcement. *Id.* ¶ 63. In addition, Jenkins trained incoming staff, including Galvez, on code compliance. *Id.* Considering that Jenkins was ranked more favorably than Galvez by two interviewers, was more qualified than Galvez,[6] and had in fact trained Galvez, it is plausible that Jenkins would have been promoted over Galvez had Curry not given Jenkins such a poor ranking. Consequently, the pleadings plausibly establish that Curry was primarily responsible for the City's failure to promote Jenkins. *See Story*, 2020 WL 5045658, at *4.

The City appears to argue that, notwithstanding Curry's ranking, Jenkins likely would not have been promoted for other reasons. Doc. 34, Mot., 12–14. However, whether the City had a legitimate, nondiscriminatory reason for refusing to promote Jenkins is not pertinent until the

---

[6] Although the City makes several arguments as to whether Jenkins was in fact less qualified than the individuals selected, these arguments are better suited for the summary judgment phase. *See Cicalese*, 924 F.3d at 768.

summary judgment stage, and even then, only *after* a plaintiff establishes his prima facie case. *See McMullin v. Miss. Dep't of Pub. Safety*, 782 F.3d 251, 258–60 (5th Cir. 2015); *see also Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511–12 (2002) ("It thus seems incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered."). Because Jenkins has sufficiently pleaded that Curry was primarily responsible for the City's refusal to promote, the Court does not consider here whether the City may have had any legitimate reason for the promotional decision.

While a more difficult question, Jenkins has also sufficiently pleaded his second premise— that Curry ranked Jenkins lower because of his race. Allegations of Curry's racial animus begin in 2014, when Curry allegedly instructed Jenkins to treat white property owners more favorably than minority property owners. *Id.* ¶¶ 27–28. Specifically, Curry asked Jenkins to enforce code violations strictly against minority property owners but give leniency to white property owners. *Id.* In addition, Jenkins claims that "Curry . . . would yell at and treat Jenkins and other non-white employees in a hostile and demeaning manner. . . . [but] treat[ed] white employees with respect." *Id.* ¶¶ 27–30. For instance, on one occasion, Curry yelled, "I am working on getting your [i.e., Jenkins] ass out of here and trying to get you fired." *Id.* ¶ 30. When Jenkins tried to walk away and deescalate the situation, Curry followed Jenkins, "made a threatening movement" toward Jenkins, got in Jenkins's face, and continued to yell at him. *Id.* Thereafter, Jenkins filed several grievances of race discrimination against Curry; however, his grievances were never resolved, and Jenkins was allegedly instructed to stop pursuing them because "no one has beaten the City." *Id.* ¶¶ 31–34. Then, when Jenkins sought a promotion in December 2020, Curry—the same supervisor who instructed Jenkins to treat individuals differently on the basis of their race, who treated minority

subordinates worse than white subordinates, and who was the subject of Jenkins's racial discrimination grievances—was one of three panel members that conducted Jenkins's interview. After the interview, Curry ranked Jenkins much less favorably than the other two panelists. *Id.* ¶¶ 62–69.

From these allegations,[7] it is plausible to conclude that Curry gave Jenkins a lower ranking because of his race. *See Cicalese*, 924 F.3d at 764–65, 768 (holding pleadings sufficient where complaint alleged discriminatory conduct and treatment preceding adverse employment action). The Second Amended Complaint recounts a specific instance in which Curry berated Jenkins in front of other employees and continued to antagonize—and seemingly threaten—him even after Jenkins attempted to remove himself from the situation. *See* Doc. 31, Second Am. Compl., ¶ 28, 30–34. Aside from the fact that Curry allegedly never treated white subordinates in this manner, the Court may infer that Curry's animus toward Jenkins was attributable to race because there are allegations that Curry previously instructed Jenkins to treat individuals differently on the basis of race. *See Stollings v. Tex. Tech Univ.*, No. 5:20-CV-250-H, 2021 WL 3748964, at *11 (N.D. Tex. Aug. 25, 2021) (Hendrix, J.). Thus, unlike his previous complaints, Jenkins's Second Amended Complaint contains "specific objective incidents of racial discrimination, such as racial comments." Doc. 30, Mem. Op. & Order., 13; *see Smith v. Dall. Cnty. Hosp. Dist.*, 2014 WL 645248, at *6 (N.D.

---

[7] The City seems to suggest that Jenkins may not rely on evidence of discrimination prior to July 16, 2020 to support his claims because the Court previously ruled "allegations of racist treatment in 2014, the ineffective grievance process thereafter, and any denial of promotion prior to July 15, 2020 under Title VII . . . are time-barred." Doc. 20, Mem. Op & Order, 20; *see* Doc. 34, Mot., 6. From this ruling, the City extrapolates that "Plaintiff's allegations that he was subject to discriminatory and retaliatory actions at any time before July 16, 2020 cannot provide the factual basis of Plaintiff's Title VII or TCHRA claims." Doc. 34, Mot., 6. The City cites no authority to support this proposition. Nevertheless, the fact that some allegations are not actionable does not mean that they cannot be considered in determining whether a plaintiff has stated a claim for discrimination. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Tex. Feb. 19, 2014) (Fish, J.); *Stollings*, 2021 WL 3748964, at *11. Moreover, allegations that the City informed Jenkins that any attempt to resolve his grievances against Curry would be futile lends further credence to Jenkins's claims of discrimination against Curry. *See Byrd v. Roadway Exp., Inc.*, 687 F.2d 85, 87 (5th Cir. 1982) (denying summary judgment in part because there was evidence that employee's complaints of discrimination antagonized employer). Finally, Jenkins's apparent qualifications for the promotion in conjunction with the relatively favorable rankings of Jenkins by two of the three interview panelists begs the question: Why did Curry rank Jenkins so poorly? Given the specific allegations of Curry's past discrimination directed at Jenkins, it is plausible that Curry ranked Jenkins poorly because of his race.

The City argues that the only allegations regarding Curry's discriminatory conduct occurred seven years before Jenkins was denied a promotion and that this temporal gap is too great to support an inference of discrimination. Doc. 34, Mot., 10–11. The Court is not convinced. First, the temporal proximity between the alleged discrimination and the adverse employment action is not fatal to an otherwise plausible claim for discrimination. *Cf. Hood v. Gulf Cap. Bank, Inc.*, No. CV H-22-1126, 2023 WL 3852812, at *5 (S.D. Tex. June 6, 2023). Second, Jenkins was removed from Curry's supervision after he filed his grievances in 2014. *See* Doc. 31, Second Am. Compl., ¶¶ 34, 46. And because he was not under Curry's supervision after he filed the grievances, there would have been be no occasion for Jenkins to observe Curry's discriminatory conduct after this point. Thus, that Jenkins did not plead any discriminatory conduct by Curry after 2014 is not fatal to his claim.

The City also claims that any inference of discrimination is belied by the fact that two individuals who were selected for promotions were within Jenkins's protected class. Doc. 34, Mot., 14. While this argument carries some weight, *see Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 (5th

Cir. 1997), ultimately, it does not carry the day. To begin, "the single fact that a plaintiff is replaced by someone within the protected class does not negate the possibility that the [adverse employment action] was motivated by discriminatory reasons." *Hornsby v. Conoco, Inc.* 777 F.2d 243, 246–47 (5th Cir. 1985). This is particularly true in a case such as this, where Curry did not have complete discretion in selecting the candidates for promotion. *See* Doc. 31, Second Am. Compl., ¶ 57 (alleging that Curry was one of three panel members). Because two other interviewers also had a say in the decision, the fact that two black candidates were promoted does not strongly negate the inference that Curry acted discriminatorily in ranking Jenkins. Accordingly, in this case, questions regarding the propriety of Curry's ranking of Jenkins "are unresolved by the observation that" Jenkins was passed over for the promotion by two individuals who were also black. *See Byrd*, 687 F.2d 87.

In sum, the Court concludes that Jenkins stated a claim for race discrimination under Title VII and the TCHRA. Jenkins has adequately alleged that Curry gave him a lower ranking because of his race and that Jenkins was ultimately denied the December 2020 promotion because of this discriminatory ranking. Accordingly, Jenkins plausibly established that he was denied a promotion because of his race. This was all that was required of Jenkins to state a claim for discrimination. The City's Motion is therefore **DENIED** as to Jenkins's race discrimination claims.

B.    *Title VII and TCHRA Claims for Retaliation*

Jenkins also claims that by denying him the December 2020 promotion, the City retaliated against him for filing grievances against Curry in violation of Title VII and the TCHRA. To state a claim for retaliation, a plaintiff must show that (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse action. *Septimus v. Univ. of Hous.*, 399 F.3d 601, 610 (5th Cir. 2005). The first two

elements are not at issue here. *See* Doc. 34, Mot., 16–17. The City argues that the Second Amended Complaint should be dismissed because Jenkins has failed to plead a causal connection between the adverse employment action—Jenkins's filing grievances against Curry in 2014—and the adverse employment action—the City's refusal to promote Jenkins in 2020. *Id.* The Court disagrees.

At the pleading stage, a plaintiff need not demonstrate that the protected activity was a but-for cause of the adverse employment action. *Tapley v. Simplifile, LC*, 2020 WL 208817, at *3 (N.D. Tex. Jan. 14, 2020) (Brown, J.) (citing *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002)). Rather, a plaintiff must only show "that the two are 'are not completely unrelated.'" *Newell v. Acadiana Plan. Comm'n Inc.*, 637 F. Supp. 3d 419, 434 (W.D. La. Oct. 25, 2022) (quoting *Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 882 (5th Cir. 2020)). This requires, at a minimum, that the plaintiff plead that the employer was aware of the protected activity. *Tapley,* 2020 WL 208817, at *3 (citing *Watts v. Kroger Co.,* 170 F.3d 505, 512 (5th Cir. 1999)).

Here, Jenkins has sufficiently pleaded a causal connection between his protected activity and the adverse employment action. After Curry learned that Jenkins filed grievances against him with the City, Curry allegedly "yelled at Jenkins and promised Jenkins that he would make sure Jenkins 'never' got a promotion." Doc. 31, Second Am. Compl., ¶ 45. When Jenkins later sought a promotion to the Supervisor II position, Curry was one of three individuals tasked with evaluating Jenkins; after Jenkins's interview, Curry gave Jenkins the lowest marks of all the candidates. *Id.* ¶ 57, 62–66, 69. In part due to the low marks from Curry—in contrast to the high marks from the other two interviewers—Jenkins was not promoted. *Id.* ¶ 68–69. The Court concludes that allegations that Curry gave Jenkins the lowest rankings—after having previously promised to

"make sure Jenkins 'never' got a promotion" in response to Jenkins's grievances—are sufficient to demonstrate a causal connection.

This conclusion is supported by a case with nearly identical facts. In *Montgomery-Smith v. Louisiana Department of Health and Hospitals*, a plaintiff engaged in a protected activity in 2007 and 2008; after the plaintiff engaged in the protected activity, the plaintiff's supervisor "told her she 'would never receive a promotion.'" No. CV 15-6369, 2017 WL 2256801, at *5–6 (E.D. La. May 22, 2017). Six to seven years later, the plaintiff applied for two separate promotions. *Id.* at *6. These positions were under the same supervisor's control. *Id.* The plaintiff was not chosen for either position, although she was qualified. *Id.* The district court held that, under these circumstances, the plaintiff presented sufficient evidence to establish a causal connection between the adverse employment action and the protected activity. *Id.*

Although *Montgomery-Smith* analyzed the causal element of a retaliation claim at the summary judgment stage, it is informative here at the pleading stage. In 2014, Jenkins engaged in a protected activity when he filed several written grievances with the City against Curry for racial discrimination and harassment. Doc. 31., Second Am. Compl., ¶¶ 31–34. As in *Montgomery-Smith*, after Jenkins engaged in this protected activity, his supervisor, Curry, allegedly "promised Jenkins that he would make sure that Jenkins 'never got a promotion.'" *Id.* ¶ 45; *Montgomery-Smith*, 2017 WL 2256801, at *5 (Plaintiff's supervisor allegedly said plaintiff "would never receive a promotion after having filed lawsuits and grievances." (alterations and quotations omitted)). And, like the plaintiff in *Montgomery-Smith*, six to seven years after engaging in a protected activity, Jenkins applied for a promotion that was at least partially under his supervisor's control. Doc. 31., Second Am. Compl., ¶¶ 67–72; *Montgomery-Smith*, 2017 WL 2256801, at *5–6 (holding that although "protected activities were initiated six to seven years before the complained of adverse employment

actions," plaintiff established causation through other evidence). Finally, like *Montgomery-Smith*, Jenkins suffered an adverse employment action when he was denied a promotion, even though he was qualified for the position. Doc. 31., Second Am. Compl., ¶¶ 67–72; *Montgomery-Smith*, 2017 WL 2256801, at *5–6. Given the district court's ruling in *Montgomery-Smith* under substantially similar facts, the Court concludes that Jenkins's allegations here support a plausible link between his protected activity and the adverse employment action.

In sum, Jenkins has adequately pleaded that there was a causal connection between his protected activity—filing grievances—and the adverse employment action—being denied a promotion. Therefore, the Court concludes that Jenkins stated a claim for retaliation under Title VII and the TCHRA. The City's Motion is therefore **DENIED** as to Jenkins's retaliation claims.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** the City's Motion to Dismiss (Doc. 34). The City is **ORDERED** to file its answer to Jenkins's Second Amended Complaint within fourteen (14) days of this Order.

**SO ORDERED.**

**SIGNED: February 13, 2024.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE